# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action Number |
| | ) | 16-00115-01-CR-W-HFS |
| Brandon C. Moody, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Pending before the Court is the MOTION TO SUPPRESS EVIDENCE AND STATEMENT (Doc. #42) filed on December 19, 2016 by defendant Brandon C. Moody ("Moody"). On February 21, 2017, the undersigned held an evidentiary hearing on Moody's motion to suppress. Moody was present and represented by his counsel, Federal Public Defender Carie Allen. The government was represented by Assistant United States Attorney Alison Dunning. At the evidentiary hearing, testimony was given by Detective Michael Ervin of the Lee's Summit Missouri Police Department and Deputy Eli Postlewait of the Jackson County Missouri Sheriff's Office. Additionally, the following exhibits were admitted into evidence:

| Number | Description |
|---|---|
| Gov't. #1-10 | Photographs |
| Gov't. #11 | Crime Inquiry and Inspection Report |
| Gov't. #12 | Lee's Summit Tow Policy |
| Gov't. #13 | Missouri Police Canine Association certification |
| Gov't #14 | K-9 Use Report |
| Gov't #15 | Waiver of Rights |
| Gov't #16 | Dash cam video |

On the basis of all the evidence adduced at the evidentiary hearing and the legal arguments advanced, the undersigned submits the following:

# PROPOSED FINDINGS OF FACT

1. Michael Ervin is a detective with the Lee's Summit Missouri Police Department on assignment to the Jackson County Drug Task Force since November of 2015. Tr. at 3, 6.

2. On July 17, 2015, Det. Ervin was on patrol in a marked police vehicle in the area of Walnut and Little near downtown Lee's Summit. Tr. at 4.

3. At approximately 6:38 p.m., Det. Ervin observed a 2001 Nissan Altima being operated by Moody travelling northbound on Walnut Street in Lee's Summit. Tr. at 6-7, 9, 11, 51.

4. Det. Ervin was familiar with Moody from prior law enforcement contact and was aware that Moody's driver's license was suspended. Tr. at 6-7, 46.

5. Det. Ervin also noted that the Altima's license plates were expired. Tr. at 6-7, 47.

6. Det. Ervin – based on a prior traffic stop of Moody – further believed that Moody owned the Altima. Tr. at 9.

7. Det. Ervin – based on prior law enforcement contact – also believed that Moody resided at 111 SW Walnut with his mother and that Moody had a firearm. Tr. at 11-14, 16, 24, 49-50.

8. Det. Ervin turned his patrol car around and initiated a traffic stop of the Altima by activating his light and sounding an air horn. Tr. at 15.

9. Moody did not immediately stop his vehicle, but instead pulled around a parked car, turned, and came to a stop in the grassy front yard of 111 SW Walnut (*i.e.*, the home he shared with his mother). Tr. at 15-16, 19, 49.

10. The front yard was not fenced in and did not have any signs posted warning people away from the yard (*e.g.*, No Trespassing, Beware of Dog). Tr. at 17.

11. Lee's Summit has an ordinance making it a nuisance violation to park a vehicle in a yard. Tr. at 36-37, 54-55.

12. After the Altima came to a stop, Moody abruptly exited the vehicle and ran into the residence. Tr. at 19, 20.

13. Moody left the vehicle unlocked with two children (ages 2 and 12) in the Altima when he ran toward the house. Tr. at 20, 22-23, 36, 45.

14. Det. Ervin also exited his vehicle and identified himself as a police officer and yelled for Moody to stop because he was under arrest. Tr. at 22-23, 25.

15. Moody ignored Det. Ervin and ran into the house. Tr. at 23, 51.

16. Shortly thereafter, Moody's mother came out the front door of the house and told Det. Ervin that Moody had run into the house and toward his bedroom. Tr. at 27.

17. Det Ervin told Moody's mother that he was there to arrest her son, at which point, Moody's mother opened the door to the house and allowed Det. Ervin to enter. Tr. at 27-28.

2

18. For safety reasons, Det. Ervin asked Moody's mother to exit the residence and asked her if there were other people in the house. Tr. at 28.

19. By this time, other officers had arrived at the scene. Tr. at 29.

20. Det. Ervin and other officers then did a sweep of the residence and determined that Moody had apparently fled out of the back of the house. Tr. at 31, 51-52.

21. While the sweep of the house was occurring, the mother of Moody's children got her children out of the Altima and left the scene. Tr. at 32.

22. Moody had fled with the keys to the Altima. Tr. at 41, 56-57.

23. Det. Ervin determined to have the Altima towed from the yard at 111 SW Walnut, in part, because "it was parked on private property causing undue inconvenience to the homeowner." Tr. at 41, 44, 57.

24. The Lee's Summit towing policy defines "abandoned property [as] any unattended motor vehicle" and authorizes the police to order a tow – even if a vehicle is on private property – if "[i]n the judgment of an officer, the abandoned vehicle/property constitutes a safety hazard or unreasonably interferes with the use of the real property by the person in possession." Gov't Ex. 12.

25. Det. Ervin also requested a drug-sniffing canine to come the scene. Tr. at 39, 53.

26. Eli Postlewait is a deputy with the canine unit of the Jackson County Sheriff's Office. Tr. at 62.

27. On July 17, 2015, Dep. Postlewait's assigned canine was Diogi (also called DJ). Tr. at 63.

28. Dep. Postlewait and Diogi have trained together in detecting narcotic odor, tacking, and search-and-rescue. Tr. at 63-66.

29. Following training, Dep. Postlewait and Diogi were certified on July 13, 2015 by the Missouri Police Canine Association. Tr. at 67-70; Gov't Ex. 13.

30. Among the areas of certification for Dep. Postlewait and Diogi were marijuana detection. Tr. at 70; Gov't Ex. 13.

31. Through the end of 2016, Dep. Postlewait and Diogi have participated in 93 drug-related sniffs, resulting in 37 positive alerts with subsequent verification (*i.e.*, drugs were found), 33 occasions where Diogi gave no positive alert, and 23 times when Diogi gave a positive alert but no drugs were located. Tr. at 74-75.

32. On July 17, 2015, Dep. Postlewait and Diogi responded to Det. Ervin's request for a drug-sniffing canine. Tr. at 77.

32. Dep. Postlewait arrived at the scene at approximately 7:34 p.m. Tr. at 78.

33. After arriving, Dep. Postlewait and Diogi walked around the Altima. Tr. at 80.

34. Diogi provided a positive alert on the console area inside the vehicle. Tr. at 39, 71-73, 80, 83-85.

3

35. Subsequently, Det. Ervin and other officers searched the vehicle, recovering two marijuana cigarettes from the front console and a loaded handgun from the floorboard underneath the driver's seat. Tr. at 39-40, 45.

## PROPOSED CONCLUSIONS OF LAW

In his motion to suppress, Moody seeks to suppress the evidence obtained as a result of the warrantless search of the Altima on July 17, 2015.[1]  With regard to the search of the Altima, without question, individuals possess a privacy interest in their property that is protected by the Fourth Amendment.  *See*, *e.g.*, *United States v. Gwinn*, 191 F.3d 874, 878 (8th Cir. 2000).  The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ."  U.S. CONST. amend. IV.  As made clear in the express language of the Fourth Amendment, however, the constitution does not forbid all searches and seizures, but only <u>unreasonable</u> searches and seizures.  *Elkins v. United States*, 364 U.S. 206, 222, 80 S. Ct. 1437, 1446 (1960).  As protection for citizens from unwarranted government intrusion, the Fourth Amendment generally requires officers to obtain a court-sanctioned search warrant based on probable cause before searching private property.  *See*, *e.g.*, *Shade v. City of Farmington, Minnesota*, 309 F.3d 1054, 1059 (8th Cir. 2000).

As previously noted, in many search and seizure scenarios, the question of legal authority (as well as reasonableness) is presumptively satisfied by a judicially-issued warrant.  In this case, Det. Ervin did not have a warrant to search the Altima.  In that regard, the Supreme Court has cautioned:

---

[1] Moody also seeks to suppress statements he subsequently made to law enforcement officers.  However, Moody's counsel has stated that suppression of the statements is based solely on a "fruit of the poisonous tree" rationale.  Consequently, the suppression of the statements depend wholly on the constitutional justification for the search of the Altima.

4

> [S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions.

*Arizona v. Gant*, 556 U.S. 332, 338, 129 S. Ct. 1710, 1716 (2009) (*quoting Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514 (1967)). In the present case, the government seeks to justify the warrantless search of the Altima as a valid search growing out of a proper traffic stop and as a valid inventory search.[2] The Court finds that both rationales, in the alternative, justify the warrantless search in this case.

Undoubtedly, "[a] traffic stop constitutes a seizure under the Fourth Amendment." *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008). However, it is well settled that "[a]n officer who observes a violation of the law has probable cause to initiate a traffic stop, and such a stop comports with the Fourth Amendment." *Id*. Similarly, "it is well established that a traffic violation – however minor – creates probable cause to stop . . . a vehicle." *United States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007). Indeed, such probable cause is not defeated even if

---

[2] The government also argues that Moody abandoned his vehicle. If so, a Fourth Amendment analysis is wholly unnecessary because "[a] warrantless search of abandoned property does not implicate the Fourth Amendment, [in that] any expectation of privacy in the item searched is forfeited upon its abandonment." *United States v. Tugwell,* 125 F.3d 600, 602 (8th Cir. 1997). It is certainly true that had Moody similarly run from his vehicle during a traffic stop occurring on public property, he would have been deemed to have abandoned his car. *Compare United States v. Smith*, 648 F.3d 654, 660 (8th Cir. 2011) (defendant abandoned his Cadillac in the Taco Bell drive-through lane when he fled on foot). *See also United States v. Vasquez,* 635 F.3d 889, 892, 894 (7th Cir. 2011) (defendant had no expectation of privacy in his vehicle after fleeing from police and abandoning the vehicle in a Wal–Mart parking lot before continuing his flight on foot); *United States v. Edwards,* 441 F.2d 749, 751 (5th Cir. 1971) ("Defendant's right to Fourth Amendment protection came to an end when he abandoned his car to the police, on a public highway, with engine running, keys in the ignition, lights on, and fled on foot."). In this case, however, Moody ran from his vehicle after driving it on to private property where he himself resided. Arguably, Moody's action in driving the car to his property before abandoning it could be evidence that he had an expectation of privacy even though he ran from the vehicle. For purposes of this motion, the Court will assume – without deciding – that Moody did not abandon his vehicle insofar as the term would mean that he cannot assert a Fourth Amendment claim regarding the vehicle.

5

there is an inference that an officer conducts a traffic stop for an ulterior motive. *See*, *e.g.*, *United States v. Wright*, 512 F.3d 466, 471 (8th Cir. 2008). In this case, without any serious question, Det. Ervin had probable cause to initiate a traffic stop of the Altima based on his belief that Moody was operating the vehicle without a valid driver's license and his observation that the Altima had an expired license plate.

Not every proper traffic stop justifies the warrantless search of the stopped vehicle and its contents. Nonetheless:

> If during a traffic stop, an officer develops a reasonable, articulable suspicion that a vehicle is carrying contraband, he has justification for greater intrusion unrelated to the traffic offense.

*United States v. White*, 42 F.3d 457, 460 (8th Cir. 1994). *See* also *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) ("[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' – to address the traffic violation . . . and attend to related safety concerns."). In this case, given the known history of Moody and in light of his actions during the stop (*i.e.,* fleeing on foot), Det. Ervin had justification to extend this particular traffic stop. In making this finding, two additional factors are borne in mind: (1) since Moody fled the scene, an extended stop did not inconvenience him in any way or extend any detention, and (2) Moody's mother did not object to the officers' continued presence on her property.

As part of his continuing investigation, Det. Ervin requested a canine sniff of Moody's vehicle. To that end, the Supreme Court has held that "the use of a well-trained narcotics-detection dog . . . during a lawful traffic stop, generally does not implicate legitimate privacy interests." *Illinois v. Caballes*, 543 U.S. 405, 409, 125 S. Ct. 834, 838 (2005). In its recent decision in *Rodriguez,* the Supreme Court, however, has found that police officers may not "extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a

6

dog sniff." *Rodriguez*, 135 S. Ct. at 1614-16 (*abrogating United States v. Morgan,* 270 F.3d 625, 632 (8th Cir. 2001)). The Court concludes that *Rodriguez* does not impact this case because Det. Ervin had sufficient reasonable suspicion and the bases for the *Rodriguez* holding (the prolonged detention of the driver) does not apply when a driver flees from the scene of the traffic stop.

Assuming that the dog is reliable,[3] a dog sniff resulting in an alert on a car, standing alone, gives an officer probable cause to believe that there are drugs present. *United States v. Bowman*, 660 F.3d 338, 345 (8th Cir. 2011); *United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir. 2007). Such probable cause, moreover, justifies a warrantless search of a car. Based on the foregoing, then, the warrantless search of the Altima would be justified if the traffic stop had occurred on a public street. An additional issue remains, however, as to whether the location of this traffic stop impacts the validity of the canine sniff of the Altima.

In *Florida v. Jardines*, 133 S. Ct. 1409 (2013), the Supreme Court addressed the question of the constitutionality of using a drug sniffing dog on a homeowner's porch without a search warrant. *Id.* at 1413. The Court first noted that the porch area where the drug sniffing dog was used constituted "curtilage," which was part of the home for purposes of the Fourth Amendment. *Id.* at 1414-15. Inasmuch as the police had encroached into a constitutionally protected area, the

---

[3] In order to establish a dog's reliability, the government must produce evidence that the dog has been trained and certified to detect drugs. *United States v. Sundby*, 186 F.3d 873, 875-76 (8th Cir. 1999). However, the government need not "give a detailed account of the dog's track record or education." *Id.* Rather, "[t]he test is 'whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime.'" *United States v. Jackson*, 811 F.3d 1049, 1051 (8th Cir. 2016) (*quoting*, *in part*, *Florida v. Harris*, 133 S. Ct. 1050, 1058 2013)). The Court finds that the reliability of Diogi was adequately demonstrated. *Compare Harris*, 133 S. Ct. at 1057 ("If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.").

7

question became "whether [the investigation] was accomplished through an unlicensed physical intrusion." *Id*. at 1415. And the answer to that question turned on whether the homeowner "had given his leave (even implicitly)" for the officers to enter the curtilage with a drug sniffing dog. *Id.*

In *Jardines*, the Court noted that cultural custom implied a license for law enforcement to "approach a home and knock, precisely because that is no more than any private citizen might do." *Id.* at 1416. However, custom did not provide a license for law enforcement to introduce a trained police dog to explore the curtilage of the home. *Id.* Accordingly, the *Jardines* court concluded that the government did not have a license for its conduct, and its incursion into the constitutionally protected area constituted a violation of the Fourth Amendment (because the officers lacked probable cause). *Id.* at 1416-17.

The initial applicability of *Jardines*, then, seemingly depends on whether the Altima was within the curtilage of Moody's residence. The Supreme Court has described "curtilage" as "the area immediately surrounding and associated with the home," and "to which the activity of home life extends." *Oliver v. United States,* 466 U.S. 170, 180, 182 n.12, 104 S. Ct. 1735, 1743 n.12 (1984). The scope of curtilage is sometimes difficult to elucidate and, thus, the Supreme Court has reasoned that "the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *United States v. Dunn*, 480 U.S. 294, 300, 107 S. Ct. 1134, 1139 (1987). Thus, the "centrally relevant consideration" in any curtilage determination is "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Dunn*, 480 U.S. at 301, 107 S. Ct. at 1139. Four factors are relevant to whether a particular area should be considered within the curtilage:

> (1) the proximity of the area claimed to be curtilage to the home,
>
> (2) whether the area is included within an enclosure surrounding the home,
>
> (3) the nature of the uses to which the area is put, and
>
> (4) the steps taken by the resident to protect the area from observation by people passing by.

*Id.* Moody argues that his front yard was curtilage. The Court disagrees.

In analyzing the *Dunn* factors, the Court finds that the only factor weighing in favor of finding the front lawn to be within the curtilage is its proximity to the house. On the other hand, however, the front lawn was open to the street and was not obstructed by a fence or other barrier. Moreover, Moody did not take any steps to protect his privacy with respect to the front lawn whether by fencing or by signage. Finally, no evidence suggests that the front lawn was used for "intimate activities of the home." An instructive recent case is *United States v. Beene*, 818 F.3d 157 (5th Cir. 2016).

In *Beene*, the court determined that a defendant's driveway was not part of the home's curtilage, so using a drug-sniffing dog in the vicinity of a vehicle parked in the driveway did not qualify as a search. *Id.* at 162. The court observed that the driveway was open to the street, nothing obstructed access to it, and the defendant had not taken any steps to protect it. *Id.* Thus, the driveway was considered an "open field" and not protected under the Fourth Amendment.

Similarly, in this case, the Court concludes that the Altima was not parked within an area that constituted curtilage. As such the drug sniff performed by Diogi was not a search about which Moody can complain. Further, Diogi's positive alert on the Altima provided Det. Ervin with probable cause to perform a warrantless search of the vehicle – a search that uncovered contraband without any constitutional infirmity.

9

In the alternative, the Court also consider the viability of the warrantless search of the Altima as an inventory search. In many divergent circumstances, law enforcement officials – as part of their community caretaking function – are authorized to impound a suspect's vehicle. *United States v. Petty*, 367 F.3d 1009, 1011-12 (8th Cir. 2004). Moreover, when taking custody of property such as a suspect's vehicle, law enforcement officers may conduct a warrantless search and inventory of the contents of the vehicle in order to protect the owner's property, to protect the police against claims of lost or stolen property, and to protect the police from potential danger. *Colorado v. Bertine*, 479 U.S. 367, 372, 107 S. Ct. 738, 741 (1987). The central inquiry in determining whether such a warrantless inventory search is reasonable is a consideration of the totality of the circumstances. *United States v. Marshall*, 986 F.2d 1171, 1174 (8th Cir. 1993). To that end, "inventory searches conducted according to standardized police procedures, which vitiate concerns of an investigatory motive or excessive discretion, are reasonable." *Id*. Consequently, to be constitutional, "[a] warrantless inventory search must be done pursuant to standard police procedures and for the purpose of protecting the car and its contents." *United States v. Best*, 135 F.3d 1223, 1225 (8th Cir. 1998).[4]

In this case, Det. Ervin relied on a particular provision of the Lee's Summit Police Department tow policy:

> Police towing of vehicle/property without consent or warrant from private property is authorized under the following conditions:
>
> . . .
>
> c.   In the judgment of an officer, the abandoned[5] vehicle/property constitutes a safety hazard or unreasonably

---

[4]   The reliance on written policies is designed "to ensure that impoundments and inventory searches are not merely a ruse for general rummaging in order to discover incriminating evidence." *Petty*, 367 F.3d at 1012.

[5]   The use of "abandoned" in the tow policy is not to be confused with the concept

10

> interferes with the use of the real property by the person in possession.

LEE'S SUMMIT POLICE DEPARTMENT, GENERAL ORDER 200.21A(III)(D)(1) (mirroring the language of MO. REV. STAT. § 304.157.1(2)).

Moody argues that impoundment of his car was not justified because it was parked on his own property. Indeed this Court was confronted with a similar argument in the recent case of *United States v. Maple*, 2016 WL 7665917, at *1 (W.D. Mo. Dec. 14, 2016), *report and recommendation adopted,* 2017 WL 80257 (W.D. Mo. Jan. 9, 2017). In *Maple*, the defendant objected to the impoundment (and related inventory search) of a vehicle parked in his driveway. In that case, this Court reasoned:

> [I]mpoundment of the [vehicle] in this case, under these facts, does not fall within the police's community caretaking responsibilities. At the time and place of the traffic stop, the [vehicle] was parked in the driveway of the residence where the vehicle's owner . . . resided. The community caretaking rationale was wholly absent – the vehicle had not been in an accident, was not parked illegally, was not trespassing on private property, and was not "impeding traffic or threatening public safety and convenience."

*Id*. at *4 (*quoting*, *in part*, *South Dakota v. Opperman*, 428 U.S. 364, 368–69, 99 S. Ct. 3092, 3097 (1976)).

Under the facts of this case, however, the Court concludes that impoundment of the Altima did fall within the community caretaking responsibilities of the police. As previously noted, the Lee's Summit Police Department's tow policy authorized the towing of an unattended vehicle from private property – even in the absence of consent or a warrant – if an officer felt the vehicle "unreasonably interfered with the use of the real property by the person in possession."

---

of "abandonment" for Fourth Amendment purposes. As used in the tow policy, a vehicle need only be "unattended" to be deemed abandoned. LEE'S SUMMIT POLICE DEPARTMENT, GENERAL ORDER 200.21A(II)(A) (mirroring the language of MO. REV. STAT. § 304.001(1)).

11

Case 4:16-cr-00115-SRB   Document 53   Filed 03/20/17   Page 11 of 13

Similarly, in articulating the bases for the impoundment rule, the Supreme Court has found that impoundment is justified when a vehicle is parked illegally or threatens convenience. *Opperman*, 428 U.S. at 369, 96 S. Ct. at 3097 ("Police will also frequently remove and impound automobiles which violate parking ordinances and [t]he authority of police to seize and remove [vehicles] threatening . . . convenience is beyond challenge."). In this case, unlike *Maple*, Moody parked his car in the front lawn of the house (and not the driveway). Lee's Summit has decreed that a public "nuisance" includes:

> The parking or storage of a vehicle on private property in an area other than in a parking area contiguous to a driveway that is improved with an asphalt/concrete surface, except that this subsection does not apply to any vehicle in an enclosed building or so located upon the property as to not be visible from any public place.

CITY OF LEE'S SUMMIT MISSOURI, CODE OF ORDINANCES § 16-205. In light of the fact that municipal ordinances deemed Moody's Altima to be a public nuisance, the Court concludes that the community caretaking function and the Lee's Summit Police Department's tow policy justified the towing of the Altima. As a consequence, Det. Ervin was authorized to conduct a warrantless inventory search of the vehicle prior to towing without violating the Fourth Amendment.

Accordingly, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** the motion to suppress filed by Brandon C. Moody [Doc. 42].

Counsel are reminded that each has 14 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are

accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

/s/ *John T. Maughmer*
**John T. Maughmer**
**United States Magistrate Judge**